UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

BRYAN A. LAMEY,                                                  Case No. 14-13729 ta7

    Debtor.

ANN RIPPBERGER,

    Plaintiff,

v.                                                                                     Adv. No. 15-01026 t

BRYAN A. LAMEY,

    Defendant.

## MEMORANDUM OPINION

After a trial on the merits, the Court must decide how much of Defendant's debt to Plaintiff is nondischargeable under 11 U.S.C. § 523(a)(15).[1] The Court concludes the nondischargeable amount is $125,000.

### I.     Findings of Fact[2]

Plaintiff and Defendant are in the midst of a divorce. The division of their property is governed by a premarital agreement signed March 5, 2010 (the "Agreement"), which provides in part:

> 5.2     The parties understand that Ann Rippberger may, from time to time, choose not to be employed while married to and residing with Bryan A. Lamey. If she should choose not to be employed, or accepts less than full employment during the marital union, Bryan A. Lamey understands that she will forego the opportunity to earn income equal to her premarital earnings history. Therefore, in the event of a dissolution of marriage, if Ann Rippberger did not receive earned income of more than $50,000.00 per annum on average while married to and residing with Bryan

---

[1] Unless otherwise noted, all statutory references are to 11 U.S.C.
[2] To the extent any finding of fact is construed as a conclusion of law, it is adopted as such, and vice versa. The Court may make additional findings of fact and conclusions of law as it deems appropriate.

A. Lamey, he agrees to make a cash payment, or distribution of property in-kind, to her according to the following terms, as limited therein:

a. If separated or residing apart after one (1) year, but before the third (3rd) anniversary: The greater of $150,000.00, or, the value of Ann Rippberger's interest in any Joint Property plus any separate property received by post-marriage gift from Bryan Lamey, at the time of marital dissolution.[3]

Paragraphs 5.2(b) - (d) contain identical language, except Plaintiff would receive: $250,000 for three to five years; $350,000 for five to seven years; and $500,000 for more than seven years.

Paragraph 5.2(e) contains examples that "are intended to be instructive on the parties' intent" regarding paragraphs 5.2(a)-(d):

Under 5.2.a, assume separation in year two (2) and ultimate marital dissolution. Assume the value of Ann Rippberger's interest in Joint Property is $100,000.00, and she has received no post-marriage separate property gifts from Bryan. Bryan may pay Ann $150,000.00 in exchange for Ann's relinquishment of her interest in Joint Property. Or, Bryan may agree to relinquish his interest in the Joint Property up to $50,000.00 so that Ann's interest equates to $150,000.00 of total value…. [T]hese examples shall [not] be construed to mean that Ann would retain the value of her Joint Property interest and post-marriage separate gift property in addition to a cash payment of $150,000.00 from Bryan. . . .

The Agreement also provides:

5.3 Any definition of the phrases "marital union" or "while married" used above shall not include any time the parties are separated and not residing in the same residence…. [P]ayment and/or distribution shall be made within a commercially reasonable time after the issuance of a decree of divorce….

And elsewhere:

18 Any controversy arising out of or relating to this Agreement, or breach thereof, shall first be submitted to the process of mediation through the services of a mediator on whom the parties mutually agree.

Attached to the Agreement is a list of each party's separate property as of March 5, 2010. Plaintiff's list of property (signed by Defendant) includes an entry for "Boats, RV's, Autos,

---

[3] The parties did not own joint property. Only gifts are at issue.

-2-

Motorcycle" valued at $65,000. The entry refers to a Cadillac Escalade Defendant gave Plaintiff as a Christmas present in 2009.[4]

Before marrying, Plaintiff and Defendant dated on and off for eight years. The relationship was volatile. Plaintiff and Defendant were married in Hawaii on March 16, 2010. After the wedding, Plaintiff and her children moved into Defendant's house.[5] Plaintiff kept her own house, however, which remained vacant. Plaintiff quit her job shortly before the wedding and was unemployed during most of the marriage. Plaintiff's average annual income never exceeded $50,000 when she lived with Defendant.

Defendant's wealth came primarily from the sale of his accounting firm, a transaction that netted him millions. Defendant kept large amounts of cash in a safe at his house. The cash came from frequent trips to Las Vegas, where he and Plaintiff traveled for high stakes gambling. Defendant brought his winnings or any remaining cash back and put it in the safe.

Defendant paid the couple's expenses, including the mortgage on his house, utilities, and other living expenses. Defendant also paid Plaintiff's credit card bills, which could total $20,000-$30,000 a month. The credit card charges were for joint and personal expenses, in unknown amounts. Finally, Defendant gave Plaintiff around $2,000 in cash each month during the marriage so Plaintiff could pay joint and personal expenses. Neither party viewed the expense payments, the credit card payments, or the monthly cash as gifts. The money went towards the maintenance and support of Plaintiff and the family.

Plaintiff and Defendant lived together from March 16, 2010 until June 2011. They had a serious fight during a June vacation, which prompted Plaintiff to return to New Mexico with her

---

[4] The title of the Cadillac remained in Defendant's name until spring 2012, when he signed it over to a third party so Plaintiff could trade it in for a Range Rover.
[5] Plaintiff has two children, and Defendant has three. The parties do not have children together.

children and move back into her house. Plaintiff also filed a divorce petition and obtained a restraining order. On June 29, 2011, Defendant's counsel wrote Plaintiff a letter offering to pay $150,000 pursuant to the Agreement. It is unclear whether Plaintiff responded.

The restraining order was dissolved around July 2011,[6] but the parties had little or no contact for the next several months. The divorce petition was eventually dismissed for lack of prosecution.

In November 2011, Plaintiff and Defendant began "rekindling" their relationship. However, they did not live together again until November 2012, when Plaintiff and her children moved back into Defendant's house.[7]

After the reconciliation Plaintiff and Defendant lived together for about seven more months. In June 2013, Plaintiff moved out for good and filed a second divorce petition. While that case was pending the parties agreed to mediate their disputes, but they never did.[8]

Of the 39 months from the marriage until Plaintiff finally moved out, the parties lived together for 22 or 23 months.

In June 2014 Defendant sold his house. By a settlement offer dated June 5, 2014, he proposed to pay $25,000 of the sale proceeds to Plaintiff in partial satisfaction of his debt under the Agreement:

> I will pay you $25,000 upon closing. I will pay you the greater of 25% of my portion of the proceeds or $50,000 assuming my distribution is $100,000 or more

---

[6] At about this time, Defendant gave Plaintiff $10,000.
[7] The testimony on this point conflicted. Plaintiff asserted she moved back in November 2011, not November 2012, but the Court accepts Defendant's timeline for three reasons. First, Defendant testified that his daughter was upset when, during her graduation party in May 2012, Plaintiff and Defendant appeared at Defendant's house for the first time as a reunited couple. Second, Plaintiff's home was sold at a foreclosure sale in 2012, and November 2012 coincides with when Plaintiff was forced to move out of her house. Third, Defendant placed Plaintiff on the payroll of his company United RV Sales, LLC in November 2012.
[8] Plaintiff's second petition also was dismissed for lack of prosecution. Defendant filed his own divorce petition in Oklahoma in September 2015. The case is pending.

-4-

> when the Las Cruces property sells. These distributions do not represent payment in full of the $150,000 represented in the Prenuptial agreement. Assuming acceptance of the current offer and sale of Las Cruces Property, the remaining balance of $57,000 will be subject to negotiation once I am employed or determined through mediation.

Plaintiff accepted the offer after making several revisions. She revised the title of the settlement offer to clarify that it was made "[p]ursuant to the Pre-marital Agreement…." She also revised the last sentence to read:

> Assuming acceptance of the current offer on sale of the marital residence and/or sale of all or a portion of the Las Cruces Property, the remaining balance ($150,000 less the total of the two above described payments) will be paid in full over a period of not more than 6 months upon my acceptance of employment.

Plaintiff received $25,000 from the sale of Defendant's house on June 20, 2014. The payment was listed on the HUD-1 Settlement Statement as a "marital settlement to Ann Rippberger."

On December 30, 2014, Defendant filed this bankruptcy case. Plaintiff brought the adversary proceeding several months later, arguing that Defendant owed her $350,000 in nondischargeable debt. Defendant responded that his obligation was $150,000, less the $25,000 partial payment and various gifts he gave Plaintiff.[9] The parties agree that the Agreement governs the amount due, and that such amount (if any) is nondischargeable under § 523(a)(15). The Agreement provides it should be construed under New Mexico law.

## II. DISCUSSION

A. <u>Construing the Agreement</u>.

1. <u>Contract Interpretation Rules</u>. "A premarital agreement is a contract," to be interpreted under the rules governing contract construction. *Kimbrell v. Kimbrell,* 2010 WL 4060974, *4 (N.M. App. 2010); *Turley v. Turley,* 103 P.2d 113 (N.M. 1940).

---

[9] The Court analyzes each alleged gift below, and incorporates the discussion into the findings by this reference.

-5-

"The central objective in construing a contract is to ascertain and give effect to the intentions of the parties." *Manuel Lujan Ins., Inc. v. Jordan,* 673 P.2d 1306, 1308 (N.M. 1983). Courts must "view the contract as a harmonious whole, give meaning to every provision, and accord each part of the contract its significance in light of other provisions." *Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*, 33 P.3d 651, 659 (N.M. App. 2001). "The purpose, meaning and intent of the parties to a contract is to be deduced from the language employed by them." *ConocoPhillips Co. v. Lyons,* 299 P.3d 844, 852 (N.M. 2013) (quoting *Cont'l Potash, Inc. v. Freeport–McMoran, Inc.*, 858 P.2d 66, 80 (N.M. 1993)).

"[W]here [the] language is not ambiguous, it is conclusive," and the inquiry ends. *Id.* However, where the language is "reasonably and fairly susceptible of different constructions, an ambiguity exists." *Benz v. Town Center Land, LLC,* 314 P.3d 688, 695 (N.M. App. 2013); *Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993) (an ambiguity exists when the parties' expressions of mutual assent lack clarity). Courts may consider extrinsic evidence to determine whether an ambiguity exists and the meaning of ambiguous language. *C.R. Anthony Co. v. Loretto Mall Partners*, 817 P.2d 238, 242-43 (N.M. 1991) (in evaluating whether a term is ambiguous, "a court may hear evidence…."). The evidence can include testimony about: (1) the parties' intent; (2) the circumstances surrounding the making of the contract; (3) usage of trade, course of dealing, and course of performance; and (4) the conduct of the parties. *ConocoPhillips, Co.,* 299 P.3d at 852; *Mark V,* 845 F.2d at 1236; *Benz,* 314 P.3d at 695.

      2.    <u>How Long Did the Parties Reside Together</u>? To determine the amount of the debt, the Court must first decide whether the periods in paragraphs 5.2 were tolled while the parties were living apart. The total time between the marriage (March 2010) and Plaintiff's final move-out (June 2013) was 39 months. That would put Defendant's obligation at $250,000

-6-

Case 15-01026-t    Doc 39    Filed 04/12/16    Entered 04/12/16 15:55:26 Page 6 of 11

(paragraph 5.2(b) of the Agreement). If the separation from June 2011 until November 2012 is deducted from the 39 months, however, the resulting 22 months or so would peg Defendant's obligation at $150,000 (paragraph 5.2(a)). Finally, if paragraph 5.3--the section that stops the clock for a separation--does not apply, the obligation could arguably be $350,000 because it has been over 5 years since the marriage and the parties are not yet divorced (paragraph 5.3(b)).

The Agreement is unclear on these points. Paragraph 5.3 defines "marital union" and "while married" to exclude times when "the parties are separated and not residing in the same residence." Neither defined term is used in the exact language giving rise to the obligations in sub-paragraphs 5.2(a)-(d), however. Despite the drafting issues, the Court holds that it furthers the purpose of the parties, and is consistent with the circumstances, to construe paragraph 5.2 so that time was tolled when the parties and their children lived in separate houses. Defendant testified this was the intent, and both parties used $150,000 (the amount due after 1-3 years) as the starting figure while negotiating a partial settlement after the final separation.

Plaintiff argues the June 2011 break-up did not "stop the clock" because it was not a permanent separation, and that Plaintiff's domicile remained the marital home owned by Defendant. While the Court agrees that not every brief separation would toll the time periods in paragraph 5.2, the June 2011 separation was significant: Plaintiff filed for divorce, got a restraining order, and moved back to her house for 16 months.

Taking into account the 16 month separation, the parties resided together for about 23 months. Paragraph 5.2(a) ($150,000 for 1-3 years) therefore applies.

       3.    <u>Should Any Gifts Reduce the $150,000?</u> The Agreement is also ambiguous about whether any gifts from Defendant to Plaintiff reduced the amount he otherwise would owe her. Paragraphs 5.2(a)-(d) require payment of the *greater of* a specified amount or the value of

-7-

post-marriage gifts. Paragraph 5.2(e), on the other hand, gives examples clearly showing that the amounts specified in paragraphs 5.2(a)-(d) are reduced by the value of any gifts.

The Court rejects the interpretation that gifts should be ignored, as it would read paragraph 5.2(e) out of the Agreement. *Bank of New Mexico v. Sholer,* 691 P.2d 465 (N.M. 1985) ("The Court will not adopt an interpretation that would create conflict…"). Paragraph 5.2(a) uses imprecise language, but overall the parties' intent is reasonably clear. Paragraph 5.2(e)'s examples are "intended to be instructive on the parties' intent under [paragraph 5.2]" and shall not "be construed to mean that [Plaintiff] would retain the value of her … post-marriage separate gift property in addition to [the specified] cash payment." Defendant's obligation to pay Plaintiff $150,000 therefore should be reduced by the value of any gifts he gave her during the marriage.

The Court analyzes whether the following alleged gifts should reduce Defendant's $150,000 obligation:

| Transfer/Payment | Was it a post-marriage gift? |
|---|---|
|  |  |
| Cadillac Escalade | No. Defendant clearly gave the Cadillac to Plaintiff before the wedding, as he acknowledged in Plaintiff's list of assets attached to the Agreement. His argument based on title ownership is overruled. |
| Payment of credit card debt | No. The evidence is that most of the charges were for joint expenses. Neither party viewed the payments as gifts. |
| Periodic cash payments totaling $2,000+ per month | No. The evidence does not show whether the cash was used for joint expenses. Even if some of it paid Plaintiff's personal expenses, which is highly likely, Defendant viewed the money as support and maintenance. There is no evidence the parties viewed the cash as gifts. |
| $2,500 plumbing bill for Plaintiff's house | No. Same. |
| $10,000 check in summer 2011 | No. There was little evidence why Defendant gave Plaintiff the check. It could have been to help Plaintiff with her expenses, as was customary during the marriage, or it could have been in consideration for Plaintiff agreeing to lift the restraining order. In any event, it was not a gift. |
| Two $7,500 checks in December, 2013. | No. These payments present a closer call, as they were made after the final break-up, but the Court finds they were not gifts. Defendant made the payments toward his wife's maintenance, as was customary. Defendant did not view the payments as gifts that reduced his obligation |

-8-

| | under the Agreement, as evidenced by his subsequent settlement offer where he stated that his debt was $150,000. |
|---|---|

The Court concludes that none of the alleged post-marriage gifts should reduce the $150,000 obligation.

    4.    <u>Partial Payment of the Debt</u>.  The $25,000 payment from the sale proceeds of Defendant's house was a partial payment of his $150,000 obligation to Plaintiff.  Plaintiff acknowledged as much in her draft of the June 5, 2014 settlement offer: she described the remaining debt under the Agreement as "$150,000 less the total of the … above described [$25,000] payment."

    B.    <u>Mediation</u>.  Defendant asserted in his answer that he owes Plaintiff nothing because she breached her mediation obligation under the Agreement.  This argument is overruled.  The Agreement requires that any dispute "shall first be submitted to the process of mediation…," but it does not spell out the consequences for failing to comply.  Further, there is no evidence about why the parties never went to mediation.  It could be that they agreed to forego mediation, or that Defendant, rather than Plaintiff, declined to mediate.[10]

    C.    <u>The Court Will Liquidate the Debt</u>.  In closing argument, Defendant argued for the first time that the divorce court, rather than this Court, should liquidate the debt.  This argument also is overruled. Bankruptcy courts and state courts have concurrent jurisdiction to determine the nondischargeability of debt under § 523(a)(15).  *In re Read,* 2015 WL 4178728, * 7 (Bankr. D.R.I.

---

[10] In closing, Defendant's counsel also mentioned that the Agreement mandates mediation, apparently as part of a jurisdiction or abstention argument.  Since the first mention of the argument was during closing, the Court concludes Defendant waived any defense based on the mediation clause.  *See, e.g., Miller Brewing Co. v. Fort Worth Distrib. Co., Inc.*, 781 F.3d 494, 497 (5th Cir. 1986) (a party waives mediation and arbitration rights when it invokes the judicial process to the detriment of the other party); *In re The Consolidated FGH Liquidating Trust*, 419 B.R. 636, 645 (Bankr. S.D. Miss. 2009) (quoting *Miller*); *In re Wheeler Hospitality, Inc.,* 2013 WL 1335642, at *24 (Bankr. N.D. Tex. 2013) (same).  *See also In re Cox Enterprises, Inc.,* 790 F.3d 1112, 1117 (10th Cir. 2015) (party waived right to compel arbitration by failing timely to assert right and substantially participating in litigation).

Case 15-01026-t    Doc 39    Filed 04/12/16    Entered 04/12/16 15:55:26 Page 9 of 11

2015); *In re Lemoine,* 2012 WL 5906939, *2 (Bankr. E.D. Pa. 2012); *In re Holland,* 2015 WL 4600382, *2 (Bankr. S.D. Ga. 2015); *In re Tinnel,* 2014 WL 2809727, *2 (Bankr. E.D. Tenn. 2014). *See also In re Taylor,* 737 F.3d 670 (10th Cir. 2013) (affirming bankruptcy court's nondischargeability determination under § 523(a)(15)). When the bankruptcy court has jurisdiction to declare a debt nondischargeable under § 523(a), it may also liquidate that debt. *In re Riebesell,* 586 F.3d 782, 793 (10th Cir. 2009) ("a bankruptcy court, in addition to declaring a debt non-dischargeable, has jurisdiction to liquidate the debt").

Even if the Court were tempted to abstain in cases of this type, it would not do so at this late stage. The complaint asks the Court to determine the amount of the nondischargeable debt, and the entire trial was on that issue. Defendant did not file a motion for abstention or similar relief. The amended answer contains arguments about tolling and gift transfers, and Defendant "requests that this Court rule that the premarital agreement is wholly dischargeable." Such a ruling would necessarily require the Court to liquidate the debt by determining the starting amount and any subsequent deductions.

D.  <u>Attorney Fees</u>. Finally, Plaintiff asks for attorney fees in connection with her prosecution of this adversary proceeding. Plaintiff appears to argue that since she could have received a fee award in divorce court for enforcing the Agreement, she should get such an award here. This argument is unavailing. Each litigant must pay their "own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164, (2015). The statutes on which Plaintiff relies are state court statutes governing the dissolution of marriage. *See* N.M.S.A. 1978 § 40-4-7 (New Mexico divorce statute, stating: "*In any proceeding for the dissolution of marriage…* The court may make an order, relative to the expenses of the proceeding, as will ensure either party an efficient preparation and presentation of

-10-

Case 15-01026-t    Doc 39    Filed 04/12/16    Entered 04/12/16 15:55:26 Page 10 of 11

his case.") (emphasis added); Okla. Stat, Title 43, § 110 (2012) (Oklahoma divorce statute, providing: "*Upon granting a decree of dissolution of marriage … the court may require either party to pay such reasonable expenses of the other …*"). Those statutes do not apply here, as this is not a divorce proceeding and the Court cannot grant a decree of dissolution. This adversary is governed by § 523(a)(15), which provides no basis for a fee award.

### III. CONCLUSION

Defendant owes Plaintiff $150,000 under the terms of the Agreement and the facts of the case, payable once the divorce is finalized. Defendant has already paid $25,000 of his obligation. The Court therefore will enter a separate declaratory judgment that the nondischargeable debt under the Agreement is $125,000.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: April 12, 2016

Copies to:

William F. Davis
6709 Academy NE, Suite A
Albuquerque, NM 87109

James T. Burns
1801-B Rio Grande Blvd NW
Albuquerque, NM 87104